## UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

Nos. 24-2415, 24-2450, 24-2506

ASSOCIATION OF NEW JERSEY RIFLE AND PISTOL CLUBS, INC., ET AL.,
*Appellants/Cross-Appellees*,

v.

ATTORNEY GENERAL OF NEW JERSEY, ET AL.,
*Appellees/Cross-Appellants*,

and

MARK CHEESEMAN, ET AL.,
*Appellants/Cross-Appellees*,

v.

ATTORNEY GENERAL OF NEW JERSEY, ET AL.,
*Appellees/Cross-Appellants*,

and

BLAKE ELLMAN, ET AL.,
*Appellants/Cross-Appellees*,

v.

ATTORNEY GENERAL OF NEW JERSEY, ET AL.,
*Appellees/Cross-Appellants*.

On Appeal from the United States District Court for the
District of New Jersey, Nos. 1:18-cv-10507; 1:22-cv-04360;
1:22-cv-04397 (Hon. Peter G. Sheridan, U.S.D.J.)

## REPLY BRIEF OF APPELLEES/CROSS-APPELLANTS

MATTHEW J. PLATKIN
*Attorney General of New Jersey*
JEREMY M. FEIGENBAUM
*Solicitor General*
TIM SHEEHAN
DANIEL VANNELLA
*Assistant Attorneys General*
CHRISTOPHER IOANNOU
*Deputy Attorney General*
Office of the New Jersey Attorney General
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 080
Trenton, NJ 08625-0080
Jeremy.Feigenbaum@njoag.gov
*Attorneys for Appellees/Cross-Appellants*

# **TABLE OF CONTENTS**

INTRODUCTION .................................................................................................1

ARGUMENT ......................................................................................................3

    I.     PLAINTIFFS' CIRCULATION-ONLY APPROACH FAILS ............3

          A.    Common Use Is Not The Exclusive Constitutional
Criterion ..................................................................................3

          B.    The Second Amendment Does Not Turn On A Circulation
Test ..........................................................................................8

    II.    NEW JERSEY'S LAW SATISFIES THE SECOND
AMENDMENT ......................................................................................14

          A.    The AR-15 Is Not In Common Use For Self-Defense .............14

          B.    The State's Restriction Is Consistent With Historical
Principles ...............................................................................17

CONCLUSION ..................................................................................................26

CERTIFICATE OF COMPLIANCE ....................................................................27

CERTIFICATE OF BAR MEMBERSHIP.............................................................28

CERTIFICATE OF SERVICE .............................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Antonyuk v. James*,
   120 F.4th 941 (2d Cir. 2024) ...................................................21, 22

*Bevis v. City of Naperville*,
   85 F.4th 1175 (7th Cir. 2023) ...................................................*passim*

*Bianchi v. Brown*,
   111 F.4th 438 (4th Cir. 2024) (en banc) ....................................*passim*

*Caetano v. Massachusetts*,
   577 U.S. 411 (2016).................................................................12

*Dist. of Colum. v. Heller*,
   554 U.S. 570 (2008).................................................................*passim*

*Hanson v. Dist. of Colum.*,
   120 F.4th 223 (D.C. Cir. 2024)................................................*passim*

*Kanter v. Barr*,
   919 F.3d 437 (7th Cir. 2019) ...................................................25

*Lara v. Comm'r Pa. State Police*,
   125 F.4th 428 (3d Cir. 2025) .............................................5, 6, 21, 22

*McDonald v. City of Chicago*,
   561 U.S. 742 (2010).................................................................4, 5

*New York v. Ferber*,
   458 U.S. 747 (1982).................................................................9

*Nunn v. State*,
   1 Ga. 243 (1846) .....................................................................24

*NYSRPA v. Bruen*,
   597 U.S. 1 (2022)....................................................................*passim*

*Ocean State Tactical v. Rhode Island*,
   95 F.4th 38 (1st Cir. 2024)......................................................*passim*

*Or. Firearms Fed'n v. Kotek*,
    682 F. Supp. 3d 874 (D. Or. 2023) ......................................................23

*Pitsilides v. Barr*,
    128 F.4th 203 (3d Cir. 2025) ...............................................19, 20, 22

*Ramos v. Louisiana*,
    590 U.S. 83 (2020)...............................................................................4

*Range v. Att'y Gen.*,
    124 F.4th 218 (3d Cir. 2024) (en banc) ..........................................5, 6

*Riccio v. Sentry Credit, Inc.*,
    954 F.3d 582 (3d Cir. 2020) (en banc) ...............................................8

*Staples v. United States*,
    511 U.S. 600 (1994)......................................................................15, 16

*United States v. Miller*,
    307 U.S. 174 (1939)........................................................................5, 12

*United States v. One (1) Palmetto State Armory PA-15 Machinegun*,
    822 F.3d 136 (3d Cir. 2016) .......................................................*passim*

*United States v. Perez-Garcia*,
    96 F.4th 1166 (9th Cir. 2024) ............................................................25

*United States v. Peterson*,
    127 F.4th 941 (5th Cir. 2025) ..............................................................4

*United States v. Price*,
    111 F.4th 392 (4th Cir. 2024) (en banc) ......................................4, 5, 6

*United States v. Quailes*,
    126 F.4th 215 (3d Cir. 2025) .............................................................21

*United States v. Rahimi*,
    602 U.S. 680 (2024)....................................................................*passim*

*Webb v. City of Philadelphia*,
    562 F.3d 256 (3d Cir. 2009) ..............................................................16

**Statutes**

18 U.S.C. § 922(g)(8) .................................................................19, 20

1837 Ala. Laws ch. 77, § 2 ......................................................24

1868 Fla. Laws 95, ch. 7, § 11 ...............................................25

Mass. Rev. Stat. ch. 134 § 6 (1836) .......................................24

1763-1775 N.J. Laws 346, ch. 539 § 10 ................................23

1849 N.Y. Laws 403-04, https://tinyurl.com/3v2xfu77 .........24

1837-1838 Tenn. Pub. Acts 200, ch. 137, §§ 1-2 ..................24

1849 Vt. Acts & Resolves 26, https://tinyurl.com/3vhmyx4k .........24, 25

**Other Authorities**

J. Story, *Commentaries on the Constitution of the United States*
    (1833) ..................................................................................24

Sharp, *Tracts, Concerning the Ancient and Only True Legal Means of
    National Defence, by a Free Militia* 18 (1782) ...................22

## INTRODUCTION

Plaintiffs' theory relies on two fundamental errors: they continue to claim that the Second Amendment rises and falls with a single common-use criterion, and they continue to treat common use as a circulation-only test. Together, the upshot of their errors is radical—that so long as a sufficient number of the weapon has circulated in the civilian market before States identify its harm and restrict it, the People, through their elected representatives, lose their right to restrict its possession forever. Every circuit to consider their argument has rejected it. *See Ocean State Tactical v. Rhode Island* (*OST*), 95 F.4th 38 (1st Cir. 2024); *Bianchi v. Brown*, 111 F.4th 438 (4th Cir. 2024) (en banc); *Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023); *Hanson v. Dist. of Colum.*, 120 F.4th 223 (D.C. Cir. 2024). And for good reason: Plaintiffs' approach is inconsistent with constitutional first principles, binding precedent, logic, and workability—and would even grant protection to machineguns. *But see Dist. of Colum. v. Heller*, 554 U.S. 570, 624 (2008); *United States v. One (1) Palmetto State Armory PA-15 Machinegun*, 822 F.3d 136, 141-44 (3d Cir. 2016).

Once stripped of their circulation-only test, Plaintiffs' responses offer no basis to invalidate assault-weapons laws. Properly understood, the Second Amendment—in its original public meaning, and consistent with centuries of American history—allows States and their People to protect against the extraordinary threats presented by unusually lethal arms. After all, the Second Amendment's original scope protects

1

a pre-existing self-defense right—but the AR-15, just like the M-16, has features that render it ill-suited and disproportionate to civilian self-defense, let alone self-defense in the home. *See Bianchi*, 111 F.4th at 450-52; *Bevis*, 85 F.4th at 1195. And even if assault weapons merited constitutional protection, "the principles that underpin our regulatory tradition" would still confirm that States can regulate them. *United States v. Rahimi*, 602 U.S. 680, 692 (2024). Throughout our Nation's history, the People have restricted weapons that pose heightened dangers to civilians—especially when the weapons penetrated the firearms market, such that their danger became apparent. Plaintiffs claim these historical laws are not a perfect fit with modern ones, but their argument would freeze state law in "amber" precisely as *Rahimi* warns against.

The Second Amendment's centuries-long tradition is one that, at all times, has permitted "representative democracy to respond to an urgent public safety crisis" by restricting the unusually dangerous weapons that made the crisis possible. *Bianchi*, 111 F.4th at 472. The People of New Jersey followed that long tradition in choosing to restrict assault weapons within their borders—just like States had restricted Bowie knives, or slungshots, or machineguns in centuries and decades prior. Plaintiffs would undo that democratic choice solely on the ground that manufacturers flooded the market with enough assault weapons such that they can never be prohibited. This Court should not turn the Second Amendment into such a counting game.

**ARGUMENT**

## I.    PLAINTIFFS' CIRCULATION-ONLY APPROACH FAILS.

Plaintiffs double down on their theory that States may never prohibit weapons in sufficient circulation, *see* ANJRPC Resp. 5-22; Cheeseman Resp. 4-18, but their theory is doubly mistaken: they erroneously treat common use as the exclusive test, and misunderstand it to represent a circulation-only analysis. A weapon's circulation has never been the relevant, let alone dispositive, constitutional test.

### A.    Common Use Is Not The Exclusive Constitutional Criterion.

Plaintiffs contend that "*only* arms that are not in common use may be banned," Cheeseman Resp. 13; ANJRPC Resp. 5-14, but they are wrong: common use is part of the threshold step, and regardless, is not an exclusive historical inquiry.

Initially, Plaintiffs misunderstand the first step of the constitutional inquiry—of which common use is a part. The Second Amendment, all agree, codified the "pre-existing" "right to keep and bear arms." *Heller*, 554 U.S. at 592, 595; *see Bianchi*, 111 F.4th at 447-48. But Plaintiffs ignore the implication: Analyzing the "plain text" of that provision thus requires courts to ask how that textual "right" would have been understood using its original public meaning. *Bianchi*, 111 F.4th at 447-48; *see also Heller*, 554 U.S. at 592 (because the right is a "pre-existing" one, the Amendment's text is informed by "historical background"). And because that pre-existing right is one of self-defense, N.J. Br. 13-14, 27-30, the "weapons protected" are the ones "in common use" for lawful self-defense, *Heller*, 554 U.S. at 625, 627. *Bruen* therefore

considered "the limitations on the Second Amendment right identified by *Heller*"—including common use—at the first, textual step: they "are inherent in the meaning of 'the right of the people.'" *United States v. Price*, 111 F.4th 392, 398-402 (4th Cir. 2024) (en banc).

Plaintiffs' responses are unavailing. Although Plaintiffs would have this Court ask only whether the regulated instrument is an "Arm,"[1] the relevant textual question also includes the scope of the pre-existing "right" to arms. *Id.* Indeed, Plaintiffs do not deny that the Bill of Rights' "right" to a "jury" codified the pre-existing right to a unanimous jury, or that other portions of the First and Sixth Amendments operate the same way. *See* Cheeseman Resp. 6-9 (admitting that this "might be true" of those rights).[2] Plaintiffs' response that the Second Amendment must be different fails: the Court has criticized Second Amendment exceptionalism, and it operates no better in this direction. *See McDonald v. City of Chicago*, 561 U.S. 742, 781 (2010) (plurality)

---

[1] Of course, whether an instrument is an "arm" is *part* of the threshold analysis. *See, e.g.*, *United States v. Peterson*, 127 F.4th 941, 945-47 (5th Cir. 2025) (explaining a suppressor is not an arm, since "[w]ithout being attached to a firearm, it would not be of much use for self-defense"). It is simply not the only part.

[2] The Cheeseman Plaintiffs suggest the plain text of the Sixth Amendment simply extends to the "jury," and then a separate historical step establishes unanimity. Resp. 7. But *Ramos v. Louisiana*, the very case on which they rely, specifically looked to sources of original public meaning—including Blackstone and state constitutions—in interpreting the "text and structure" of the Sixth Amendment and the pre-existing "right" to a "jury" that it codified. 590 U.S. 83, 89-92 (2020).

(holding the Second Amendment is not "subject to an entirely different body of rules than the other Bill of Rights guarantees").

In reality, Plaintiffs simply misunderstand *Bruen*. As courts have noted, *Bruen* discussed "common use" as one of three threshold "inquiries at step one," to assess the original scope of the Second Amendment right, before considering the Nation's regulatory tradition. *See Price*, 111 F.4th at 398-402 (discussing *Heller*, *Bruen*, and *United States v. Miller*, 307 U.S. 174 (1939), and adding that *Bruen* "confirm[s] that the limitations on the Second Amendment right identified by *Heller* … should be addressed at the first step of its new framework"). Far from conflating *Bruen*'s steps, this creates a coherent test: courts assess the original scope of the textual right, using usual tools of original public meaning, *see Bruen*, 597 U.S. at 24, 32-33 (considering "common use" to assess whether the Second Amendment "presumptively protects" the conduct), and whenever the underlying right is implicated, canvass the Nation's regulatory tradition to determine if the law could still be "justif[ied]" as "consistent" with our traditional regulatory principles, *id.* at 24.

*Lara* and *Range* are not to the contrary. *See Lara v. Comm'r Pa. State Police*, 125 F.4th 428 (3d Cir. 2025); *Range v. Att'y Gen.*, 124 F.4th 218 (3d Cir. 2024) (en banc). Those cases considered whether 18-to-20-year-olds and felons, respectively, were part of "the people" under the Second Amendment's text. *See Lara*, 125 F.4th at 435-38; *Range*, 124 F.4th at 226-28. Those cases answered the "people" question

without taking a "retrospective lens at the first step" for inapposite reasons: limiting "the people" to specific groups at the first step would have produced "an inconsistent reading of 'the people' across the Constitution" and violated the Supreme Court's definition of the term. *Lara*, 125 F.4th at 435-38; *Range*, 124 F.4th at 226-28. Those principles cut the opposite way here: common use fits in the first step, where *Bruen* placed it, and is consistent with the original public meaning accorded to other rights. *See Price*, 111 F.4th at 402 & n.4 (finding common use is a "step-one inquiry" and recognizing issue is distinct from whether felons count among "the people").

Finally, regardless of whether common use belongs at the first or second step, common use still would not be the *exclusive* historical tradition for assessing arms prohibitions—as courts, and even some dissents on which Plaintiffs rely, recognize. *See, e.g.*, *Hanson*, 120 F.4th at 233-34 & n.4 (rejecting the argument that "to find an arm is in common use renders any restriction of that arm unconstitutional"); *Bianchi*, 111 F.4th at 460 ("[T]he Supreme Court did not posit that a weapon's common use is conclusive evidence that it cannot be banned."); *Bevis*, 85 F.4th at 1211-12 (Brennan, J., dissenting) ("[J]ust because a weapon is in common use does not necessarily mean a government is barred from regulating it."). Plaintiffs provide *no* historical sources—not a treatise, statute, decision, or anything else—endorsing the view that prohibitions on arms in common use are categorically unconstitutional. To

6

the contrary, the State offered historical evidence that Legislatures restricted arms only once they became widespread. *See* N.J. Br. 45-52; *infra* at 22-26.

Absent historical evidence supporting the idea of common-use as an exclusive test, Plaintiffs erroneously claim this rule comes from *Heller* and *Bruen*. But though *Heller* and *Bruen* acknowledge that *one* class of arms that can be restricted are arms not in common use, the converse does not follow; these rulings conspicuously never said that common-use is the *exclusive* basis for valid prohibitions. *See Bianchi*, 111 F.4th at 460. *Heller* cited support from sources like Blackstone for common-use as one permissible legal limit, but the Court emphasized that it was not "undertak[ing] an exhaustive historical analysis today of the full scope of the Second Amendment," 554 U.S. at 626-27—meaning it was not foreclosing use of further history to support further limits on arms possession. *See Bruen*, 597 U.S. at 72 (Alito, J., concurring) (agreeing the Court did not "decide anything about the kinds of weapons that people may possess").[3] That is why *Heller* did not consider the many historical regulations (including on Bowie knives and slingshots) detailed here. This Court should.

---

[3] That *Heller* found unlawful a categorical ban on all handguns—the "quintessential self-defense weapon"—does not help Plaintiffs either. 554 U.S. at 627-29. The Court emphasized (1) "the historically unprecedented nature of the [handgun] ban," *Bruen*, 597 U.S. at 22; *see Heller*, 554 U.S. at 629, and (2) the features of the handgun that made it suited to self-defense, *Heller*, 554 U.S. at 627-29. It did not make a blanket declaration that any prohibition on commonly owned firearms is unconstitutional. *See Palmetto*, 822 F.3d at 143-44 (agreeing *Heller* "does not mean that a categorical ban on any particular type of bearable arm is unconstitutional").

B.    <u>The Second Amendment Does Not Turn On A Circulation Test</u>.

Plaintiffs compound their error by claiming not only that "common use" is the exclusive legal test, but that this test looks only at a weapon's circulation. *See, e.g.*, ANJRPC Resp. 14, 17-18, 22 (finding weapon's dangerous features and limited self-defense use "irrelevant" if it is "already in wide circulation"); Cheeseman Resp. 13 (agreeing weapon's permanent constitutional protection turns only on evidence like "consumer surveys, dealer surveys, and firearm manufacturing data"). As the State has explained, this claim runs into five distinct problems: first principles, precedent, logic, administrability, and impermissible results. *See* Br. 30-38. Plaintiffs' attempts to rehabilitate their approach are unavailing. *See Bianchi*, 111 F.4th at 459-61; *Bevis*, 85 F.4th at 1198-99; *OST*, 95 F.4th at 50-51; *Hanson*, 120 F.4th at 232-33.[4]

*First*, Plaintiffs' circulation-only rule is contrary to constitutional principles. Plaintiffs all but concede that the approach finds no footing in broader constitutional doctrine: their briefs expressly confess that the numerical approach is "only a Second Amendment principle" rather than a "generally applicable principle of constitutional law." Cheeseman Resp. 29; ANJRPC Resp. 18. But as explained above, the Supreme

---

[4] Plaintiffs chastise New Jersey for "pervasive" reliance on, even "[p]arroting," these four circuit decisions. ANJRPC Resp. 19. Exactly so: these considered opinions are persuasive, and Plaintiffs offer no contrary circuit decision. *See, e.g.*, *Riccio v. Sentry Credit, Inc.*, 954 F.3d 582, 591-92 (3d Cir. 2020) (en banc) ("[T]his Court should be reluctant to contradict the unanimous position of other circuits.").

Court has rejected Second Amendment exceptionalism—exceptionalism that is no more warranted when it favors the plaintiffs. *See Bruen*, 597 U.S. at 24 (noting that its "Second Amendment standard accords with how we protect other constitutional rights"). Nor do Plaintiffs cite anything in the Second Amendment's language that justifies a counting exercise otherwise unknown to constitutional law.[5]

*Second*, while Plaintiffs claim that this circulation-only inquiry is nevertheless compelled by Second Amendment caselaw, neither the Supreme Court nor this Court has assessed a weapon's protection based only on its numerosity. *Contra* Cheeseman Resp. 12-18; ANJRPC Resp. 14-22. Instead, *Heller* "examine[d] the character of the weapon[s]" discussed, 554 U.S. at 622, language Plaintiffs elide. The Court deemed the handgun "the quintessential self-defense weapon" based upon objective features, including its size, weight, and shape, *id.* at 629—all of which would have been wholly irrelevant if circulation alone resolved that constitutional challenge. Nor can Plaintiffs explain how their theory comports with the *Heller* majority's confident statements that short-barreled shotguns and "weapons that are most useful in military service" like M-16 rifles "may be banned," without addressing the fact that over

---

[5] Plaintiffs admit that a circulation-only test would be inappropriate for, *e.g.*, statutes restricting child pornography, but claim this example is "remarkably poor" because child pornography is obscene. Cheeseman Resp. 29. But First Amendment doctrine makes clear the "test for child pornography is separate from the obscenity standard," *New York v. Ferber*, 458 U.S. 747, 761 & n.12, 764-65 (1982), nor does obscenity turn solely on a material's circulation in society regardless.

100,000 machineguns were in civilian circulation. *Id.* at 625-27. They likewise have no answer to *Palmetto*, which found that machineguns were unprotected as "exceedingly dangerous weapons" that "are not in common use for lawful purposes" without ever asking how many civilians owned them. 822 F.3d at 142-44.

*Third*, there are good reasons no doctrine and no case relies upon a circulation-only rule: it is logically unsound. As the State explained, the test is circular, because a weapon's circulation turns on the laws in place as well as market forces. *See* N.J. Br. 32-34; *Bevis*, 85 F.4th at 1190. Plaintiffs do not deny their test has at least some circularity, and that arms can be more or less widespread based on when Legislatures restrict them. *See Bianchi*, 111 F.4th at 460-61 (criticizing claim that turns on how quickly arm could "proliferate before lawmakers comprehend that they are ill-suited or disproportionate to self-defense"); *OST*, 95 F.4th at 50-51 ("It defies reason to say that legislatures can only ban a weapon if they ban it at (or around) the time of its introduction, before its danger becomes manifest."). Plaintiffs chastise these circuits for "grad[ing] the Supreme Court's work." ANJRPC Resp. 19. But Plaintiffs assume their conclusion: that the Court actually did adopt a numbers-only approach. *But see supra* at 9-10. Instead, the State's and circuits' point is much more modest: the fact that Plaintiffs' approach is illogical and circular is a strong indication that this is not the dispositive criterion the Supreme Court employed.

10

Plaintiffs propose an alleged solution to the circularity problem—that an arm must be both dangerous *and* unusual before it can be regulated, ANJRPC Resp. 21-22; Cheeseman Resp. 30-31—but that response falls short for three reasons. For one, this addresses the problem in only one direction: Plaintiffs could prevail by showing a weapon is not "dangerous" regardless of numerosity, but in their telling, the State must *always* establish that the arm is numerically "unusual." ANJRPC Resp. 13-14, 21; Cheeseman Resp. 12-18. In other words, in their view, the People would always lose their right to regulate a weapon based on nothing more than Plaintiffs' circular circulation test. Furthermore, Plaintiffs' reliance on an independent "dangerousness" limit to mitigate circularity is itself inconsistent, given Plaintiffs' arguments that neither legislatures nor courts can appropriately evaluate dangerousness. *Compare* ANJRPC Resp. 21-22. And finally, Plaintiffs misunderstand *Heller* and its historical sources, which did not use "dangerous" and "unusual" as two independent tests. *See Hanson*, 120 F.4th at 238 n.7 (noting "dangerous" makes no sense standing alone, as all firearms are dangerous); N.J. Br. 38-40 (sources use dangerous-*and*-unusual and dangerous-*or*-unusual formulations, to connote "unusually dangerous").

*Fourth*, Plaintiffs come up empty in addressing the workability of a numbers-only test. Plaintiffs' replies conspicuously fail to provide a number at which there is sufficient circulation such that the People forever lose power to regulate the arm—no matter how dangerous or disproportionate to self-defense. *See* Cheeseman Resp.

34 (refusing to provide circulation-only "lower bound of constitutional protection"). Nor is it clear what that lower-bound number would be, or how courts can divine it: a "minimum" circulation number does not appear in other constitutional doctrines, in the Second Amendment itself, or in *Heller* or *Bruen* (or *Miller*, *Palmetto*, or any other case). That Plaintiffs' dispositive legal test turns on a number that they cannot identify, and where it seems impossible to divine with any certainty or based on any traditional source, is troubling. Plaintiffs claim that States' and circuits' concerns with their test are overcome by "the choices of the American people." Cheeseman Resp. 30; ANJRPC Resp. 22. Yet the question still remains: how many gunowners' choices does it take to trigger inviolable constitutional protection?

*Fifth*, Plaintiffs' refusal to provide any numeric threshold exacerbates another problem: adopting their test would run afoul of *Heller* and *Palmetto* by implying that machinegun bans are unconstitutional. As the State explained, Br. 35, the evidence identifies 176,000 machineguns in civilian circulation, just 24,000 less than the stun-gun circulation in the concurrence on which Plaintiffs rely. *See* Cheeseman Resp. 18 (citing *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring)); ANJRPC Resp. 13. Unless the minimum circulation number lies perfectly between 176,000 and 200,000—and Plaintiffs give no reason in text, history, or precedent to think it does—Plaintiffs' test would render every machinegun ban unconstitutional. *Contra* Cheeseman Resp. 34 (stating machineguns are "owned in significantly lower

numbers" than stun guns, without explaining why 24,000 is a dispositive delta). The ANJRPC Plaintiffs halfheartedly respond that maybe thousands of machineguns are mere "collector's items," Resp. 21 n.6,[6] but supply no basis to believe this is so. *See Bevis*, 85 F.4th at 1195 (explaining it is "not too much of a stretch to think that some people might like the fully automatic feature of a machinegun, if they were hoping to defend their families, their property, and themselves"). And it would be strange, if not downright "startling," for the constitutionality of all machinegun laws to turn on whether that supposition is true. *See Heller*, 554 U.S. at 624.

Plaintiffs' two other responses to the machinegun problem fare no better. For one, Plaintiffs repeatedly distinguish machineguns from assault weapons based upon their "ability to fire in automatic or burst mode," Cheeseman Resp. 20-21; ANJRPC Resp. 32-34, and thus claim that machineguns can be banned. But their focus on the weapon's features *contradicts* their exclusive circulation test. For another, Plaintiffs' claims that automatic weapons could be regulated because they were a "commercial failure" among "law-abiding citizens" from that weapon's development "in the early 1920s" to its regulation shortly thereafter, ANJRPC Resp. 20, falls short. After all, "submachine guns were expensive" at that time—a key reason they were "favored by those with resources," including criminals. JA1374 (Roth Rpt. ¶54). Yet "an

---

[6] This contradicts the Cheeseman Plaintiffs' argument that common use covers "any lawful purpose," Resp. 14, which would include collection.

13

item's entitlement to constitutional protection" cannot "depend[] on its price." *Bevis*, 85 F.4th at 1195. In any event, this says "nothing about how use of those guns would have evolved, had they remained legal and readily available" in the subsequent years in which gun ownership increased dramatically. *Id.* at 1195 & n.7. Indeed, Plaintiffs do not deny that 176,000 are in circulation today. *Heller* and *Palmetto* are right that machineguns can be banned—making them irreconcilable with Plaintiffs' test.

## II.    NEW JERSEY'S LAW SATISFIES THE SECOND AMENDMENT.

The assault-weapons law survives because the regulated assault weapon is not in common use for self-defense and the law fits historical principles.

### A.    The AR-15 Is Not In Common Use For Self-Defense.

Once this Court rejects Plaintiffs' view that common-use is a circulation test, the remainder of the analysis is straightforward: the AR-15 is not in common use for self-defense given that its objective "combat-functional features make it ill-suited for the vast majority of self-defense situations in which civilians find themselves." N.J. Br. 21 (quoting *Bianchi*, 111 F.4th at 458); *see* N.J. Br. 13-26 (discussing AR-15's firepower, features that support sustained repeat firing, and features that support long-range shooting; significant overlap with the M-16; and disproportionate use in modern explosion of mass shootings). Plaintiffs' miscellaneous responses falter.

Begin with their primary argument: the AR-15 gets inviolable protection, but the M-16 does not, based on the latter's automatic capacity. ANJRPC Resp. 31-37;

Cheeseman Resp. 20-21. Initially, as multiple courts have explained, that difference "pales in significance compared to the plethora of combat-functional features that makes the two weapons so similar." *Bianchi*, 111 F.4th at 456; *Bevis*, 85 F.4th at 1195-97. Plaintiffs reply that automatic "rate of fire" is a key distinction because it supports "suppression that can be needed on the battlefield, not the accuracy needed for self-defense in the home," and threatens a shooter's "loved ones and property." ANJRPC Resp. 33-34. But the same can be said of a weapon that shoots "60 rounds per minute" with features that support long-range or sustained firing—none of which is appropriate for self-defense in the home. *Compare* ANJRPC Resp. 33, *with* N.J. Br. 17-23; *Bianchi*, 111 F.4th at 454-56. Plaintiffs thus cannot deny that the military relies on semiautomatic firing; all they can muster is that the military prefers to have automatic capacity *available*, though "not deployed regularly." ANJRPC Resp. 33-34 (quoting *Bianchi*, 111 F.4th at 528 (Richardson, J., dissenting)). Nor do Plaintiffs refute the ease with which owners convert assault weapons into automatic weapons via bump stocks and achieve similar rates of fire. *See* N.J. Br. 18-19.

Plaintiffs' reliance upon *Staples v. United States*, 511 U.S. 600 (1994), cannot support their distinction either. *See* ANJRPC Resp. 31-32; Cheeseman Resp. 29-30. *Staples* "had nothing to do with the Second Amendment," *Bevis*, 85 F.4th at 1194; it resolved a question regarding *mens rea* under the National Firearms Act. So when *Staples* noted that "guns falling outside th[e] categories" of machineguns, sawed-off

shotguns, artillery pieces, and grenades "traditionally have been widely accepted as lawful possessions," 511 U.S. at 611-12, 619, the Court was appropriately describing federal statutory law as it stood then—before the Assault Weapons Ban, "when as a matter of federal law it was lawful to own an AR-15," *Bevis*, 85 F.4th at 1194-95. If anything, *Staples* "reinforces" that the AR-15 can be restricted, *id.*, as it recognized "[t]he AR-15 is the civilian version of the military's M-16 rifle" easily "modified" to fire automatically. 511 U.S. at 603.

Other than seeking to draw an unsupported bright-line between automatic and assault weapons, Plaintiffs fail to seriously refute that the AR-15 "is almost the same gun as the M16 machinegun," *Bevis*, 85 F.4th at 1195-97, with a suite of militaristic features that results in the weapon's "phenomenal lethality," *Bianchi*, 111 F.4th at 455, and its disproportionate use in mass shootings and attacks on law enforcement, N.J. Br. 24-26.[7] Plaintiffs concede that the AR-15 shares the same "effective range, muzzle velocity, and semiautomatic rate of fire" as the M-16. Cheeseman Resp. 21. That means AR-15 bullets cut through most law-enforcement body armor and cause catastrophic damage to the body. N.J. Br. 17-26. Given that fearsome firing power, using an AR-15, even without large-capacity magazines, significantly increases the

---

[7] And the efforts they do make are contrary to the record. The Cheeseman Plaintiffs rely on extra-record and hearsay evidence, Resp. 19-27, yet this Court "do[es] not consider material on appeal that is outside of the district court record." *Webb v. City of Philadelphia*, 562 F.3d 256, 261 n.4 (3d Cir. 2009). They also impugn one of the State's experts without having filed a *Daubert* motion. Resp. 25-26.

16

number of casualties in mass shootings. N.J. Br. 19-20. And while Plaintiffs attempt to argue that individual features (like a barrel shroud or flash suppressor) have self-defense benefits, they ignore the overwhelming expert evidence that these features—especially combined, which is what New Jersey law prohibits—are designed for the kinds of long-range or repeat, sustained firing inappropriate and disproportionate to self-defense. *See* JA1857-59 (Yurgealitis Rpt. ¶¶117-29).

Finally, Plaintiffs fail to effectively disprove the AR-15's disproportionate use in mass shootings. *Compare* Cheeseman Resp. 26-27, *and* ANJRPC Resp. 15 n.1, *with* N.J. Br. 24-26. Plaintiffs' response that handguns are more often involved in mass shootings is unremarkable: handgun ownership rates are magnitudes higher than assault weapons. *See* JA1629, JA1635, JA1647-51 (Klarevas Rpt. ¶¶11, 14, 28-31). And the claim that assault weapons' use in mass shootings is "proportionate to their general popularity" is simply wrong, as their data (even if true) reflects only the percentage of "firearms sold for over a decade," not their total national ownership rates. Cheeseman Resp. 27; *see Bianchi*, 111 F.4th at 456 ("[A]lthough AR-platform rifles constituted about 5% of the firearms in the United States, they were used in 25% of mass shootings"). Like the M-16, the AR-15 can be restricted.

B. <u>The State's Restriction Is Consistent With Historical Principles</u>.

Alternatively, this Court could uphold the assault-weapons restriction simply by recognizing that this law falls well within "principles that underpin our regulatory

tradition." *Rahimi*, 602 U.S. at 692. Indeed, every circuit to consider this issue post-*Bruen* agrees that unbroken history spanning centuries supports laws prohibiting the "sale, manufacture, and possession of weapons … particularly useful for offensive and criminal purposes" while protecting access to weapons suitable to self-defense. N.J. Br. 45 (citing *Bianchi*, 111 F.4th at 471; *OST*, 95 F.4th at 45-50; *Hanson*, 120 F.4th at 237-40; *Bevis*, 85 F.4th at 1199-1202). These restrictions were present at the Founding, during antebellum, at Reconstruction, and throughout the 20th Century—including limits on Bowie knives, slungshots, and machineguns. Br. 46-52. Plaintiffs lodge three objections: they claim this Court may consider only past prohibitions on *possession*, not historical carry prohibitions, sale restrictions, and taxes; argue that much relevant history must be disregarded as too late; and offer a smorgasbord of challenges to specific historical evidence. None persuades.

1. Plaintiffs' responses rest on the very "misunderst[andings]" of the Second Amendment *Rahimi* warns against. 602 U.S. at 691-92. As New Jersey explained, States have long adopted a range of policy responses to address arms that proliferate and present heightened dangers through offensive and criminal misuse—including restricting their carry, restricting manufacture and sale, imposing extreme taxes, or prohibiting possession outright. *See* Br. 46-52. Plaintiffs urge this Court to reject this evidence, responding that the record "fails to identify almost any historical law that banned an arm that had long been used by law-abiding citizens for lawful purposes."

ANJRPC Resp. 23-24 (adding that "most" of these laws did not restrict possession). That response was questionable under *Bruen*, which cautioned against holding States to "dead ringer[s]" or "historical twin[s]." 597 U.S. at 30. But it is untenable now.

*Rahimi* and *Pitsilides v. Barr*, 128 F.4th 203 (3d Cir. 2025), confirm modern possession statutes can be supported by more than predecessor possession bans. The central Second Amendment question is whether a modern law fits within "principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692. A principles-based inquiry "does not reduce historical analogizing to an exercise in matching elements of modern laws to those of their historical predecessors." *Pitsilides*, 128 F.4th at 210. Rather, courts ask "whether the principles embodied in different strands of historical firearm regulations, taken together, support contemporary restrictions"—even prior measures "dissimilar" to the challenged law. *Id.* at 209-10. Said simply, the Second Amendment does not "suggest a law trapped in amber"; it "permits more than just those regulations identical to ones that could be found in 1791." *Rahimi*, 602 U.S. at 691-92; *see Bruen*, 597 U.S. at 27 (emphasizing this principle for "cases implicating unprecedented societal concerns or dramatic technological changes").

Indeed, were Plaintiffs' approach correct, *Rahimi* would be wrong. There, the Court relied upon surety statutes and going-armed laws to uphold the federal ban on firearms possession by those subject to a domestic-violence restraining order, 18 U.S.C. § 922(g)(8), even though neither banned firearms possession like § 922(g)(8):

surety statutes only required "individuals suspected of future misbehavior to post a bond," 602 U.S. at 695, and going-armed laws did not stop violators from thereafter "carrying any firearm or ammunition, in any manner, in any place, at any time, and for any reason, *id.* at 770 (Thomas, J., dissenting). But while Section 922(g)(8)'s possession ban was "by no means identical" to historical regimes that did not restrict possession, the Court had "no trouble concluding" that federal law fit the principle of "allow[ing] the Government to disarm individuals who present a credible threat to the physical safety of others." *Id.* at 698, 700 (majority).

So too here. The State submitted reams of statutes restricting weapons whose proliferation presented unusual danger—from Bowie knives to slingshots, from the Founders' lifetime through Reconstruction and beyond. To be sure, not every State adopted an identical policy to confront this public-safety problem. But their choices to restrict carry, or to impose taxes, hardly proves that possession restrictions were unlawful, since States do not "maximally exercise[] their power to regulate." *Rahimi*, 602 U.S. at 739-40 (Barrett, J., concurring) (rejecting this "'use it or lose it' view" of State legislative authority); *Pitsilides*, 128 F.4th at 209 (demanding that courts be "vigilant" in avoiding assumption that historical legislatures "maximally" regulated to full extent of legal authority); *see also* JA1106-07 (Spitzer Rpt. ¶69) (providing a policy reason that many States would have chosen to restrict carry or sale rather than possession—*i.e.*, they lacked a sufficient enforcement apparatus to implement bans).

20

Instead, it is the inevitable result of "federalism" and "democracy" that States could employ a range of responses to shared problems—and yet all can fall within the same underlying constitutional principle. *Bianchi*, 111 F.4th at 447.

2. The Cheeseman Plaintiffs also wrongly try to discount record evidence by arguing that historical statutes "come too late in time to inform our understanding of the Second Amendment." Resp. 39-40 (arguing that "only trap guns and gunpowder regulations" are from the relevant period).[8] This Court has explained that where there is an "irreconcilable conflict" between the evidence at the Founding and subsequent historical periods, it will not consider subsequent evidence. *Lara*, 125 F.4th at 441-45 & n.19 (perceiving such a conflict between Founding-era militia laws allowing 18-to-20-year-olds to be armed and Reconstruction-era laws disarming the same age group). Absent conflict, however, courts consistently find "post-enactment history" to be a "valuable resource" because it provides additional data points to "enhance[]" the "understanding of the Second Amendment's original public meaning." *United States v. Quailes*, 126 F.4th 215, 222 n.8 (3d Cir. 2025); *Antonyuk v. James*, 120 F.4th 941, 969-74 (2d Cir. 2024) (agreeing that absent any conflict, "the prevailing understanding of the right to bear arms in 1868 and 1791 are both focal points of our analysis"); *Rahimi*, 602 U.S. at 692 n.1; *Bruen*, 597 U.S. at 37-38, 66 n.28.

---

[8] Even accepting the Cheeseman Plaintiffs' frame that only Founding-era evidence matters, the first restrictions on Bowie knives are from the Founding era. *See Heller*, 554 U.S. at 605-08 (treating sources from 1820s and 1830s as "founding-era").

And there is no such conflict here. In contrast to *Lara*, the most the Cheeseman Plaintiffs could possibly say is that there is regulatory "silence" during the Founding. *But see OST*, 95 F.4th at 49 (crediting Founding-era gunpowder laws). "Reasoning from historical silence" is, however, quite "risky," and cannot support a "conflict" between two historical eras, *Antonyuk*, 120 F.4th at 969-74, because—as explained above—States do not always "maximally" regulate to their full constitutional limits. *Pitsilides*, 128 F.4th at 209. This is thus precisely the sort of case in which courts consider a consistent body of historical evidence to identify our Nation's regulatory principles—a tradition spanning Founding-era limits on trap guns, gunpowder, and Bowie knives; to antebellum slungshot laws; to 20th-century machinegun bans; to modern laws a wide range of States adopted to restrict assault weapons.

3. With these methodological errors set aside, Plaintiffs' smorgasbord of other objections fails to persuade. Begin with English law, under which the Crown banned weapons which "favour[ed] the designs of murderers," like crossbows, but allowed for "proper arms for defence." Sharp, *Tracts, Concerning the Ancient and Only True Legal Means of National Defence, by a Free Militia* 18 (1782). Plaintiffs claim that crossbows were numerically "unusual" weapons because their banning "was borne primarily out of Henry VIII's concern that preferences for other weapons would 'threaten Englishmen's proficiency with the longbow,'" Cheeseman Resp. 37, but that concern would make sense only if the crossbow proliferated among Englishmen.

22

Nor does Plaintiffs' plea to ignore English evidence persuade. *Contra* Cheeseman Resp. 11, 36-37. *Rahimi* considered English laws "barring people from misusing weapons to harm or menace others," as relevant "regulations targeting individuals who physically threatened others persisted" in America, including via surety statutes and going-armed laws that "developed" by "the 1700s and early 1800s." 602 U.S. at 693-95 (citing statutes and English Bill of Rights, which provided a right to "Arms for [subjects'] Defence suitable to their Conditions, and as allowed by Law").

Likewise here, the States adopted weapons restrictions in the 1700s and early 1800s. New Jersey banned trap guns in 1771 because they were considered "most dangerous," even though users of trap guns "typically did so to defend their places of business, properties, or possessions." JA 1113-14 (Spitzer Rpt. ¶¶ 79-80) (citing 1763-1775 N.J. Laws 346, ch. 539 § 10). Plaintiffs' protest that trap guns "are not bearable arms," ANJRPC Resp. 24; Cheeseman Resp. 38, is a matter of semantics, as trap-gun laws like New Jersey's were concerned with the dangers posed by certain weapons configurations or features—like modern assault-weapons statutes. *See* N.J. Br. 5-6 (discussing particular "features that characterize an impermissible 'assault firearm'"); *cf. Or. Firearms Fed'n v. Kotek*, 682 F. Supp. 3d 874, 928-29 (D. Or. 2023) (agreeing that trap gun laws are historically relevant because they "sought to regulate a particularly dangerous feature of a firearm").

Consider too the Bowie knife, whose proliferation in the 1830s and functional banning by three States that same decade is highly probative Founding-era evidence. *See* N.J. Br. 47-49. Bowie knives "proliferated throughout the United States" and "could be used in self-defense against a violent aggressor," but were regulated once their "potential misuse became apparent." JA27-28. *Contra* Cheeseman Resp. 41 (speculating Bowie Knives were numerically unusual). In 1837—just one year after a surety statute relied on by *Rahimi*, 602 U.S. at 695 (citing Mass. Rev. Stat. ch. 134 § 6 (1836)), and a few years after Story's *Commentaries*, *see Heller*, 554 U.S. at 593 (citing 3 J. Story, *Commentaries on the Constitution of the United States* (1833)), Georgia "really did ban Bowie knives." ANJRPC Resp. 26; Cheeseman Resp. 40.[9] That same year, Tennessee banned their sale, and Alabama taxed their sale at the prohibitive rate of $100. 1837-1838 Tenn. Pub. Acts 200, ch. 137, §§ 1-2 (JA1295); 1837 Ala. Laws ch. 77, § 2 (JA1219-20). Plaintiffs ignore these laws completely, Cheeseman Resp. 40, or wrongly minimize their similarity, ANJRPC Resp. 26.

Laws restricting slungshots before, during, and after Reconstruction support the same principle. In 1849, both New York and Vermont banned their manufacture, sale, and possession. 1849 N.Y. Laws 403-04, https://tinyurl.com/3v2xfu77; 1849

---

[9] Plaintiffs' reference to *Nunn v. State* is a red herring, ANJRPC Resp. 26 (citing 1 Ga. 243 (1846)), as that decision stands only for the proposition that Georgia could not "altogether prohibit public carry" of *pistols*. *Bruen*, 597 U.S. at 54. The ban on Bowie knives was not at issue, much less invalidated.

Vt. Acts & Resolves 26, https://tinyurl.com/3vhmyx4k. A year later, Massachusetts banned manufacture and sale, JA1259-60, with Florida following suit in 1868, 1868 Fla. Laws 95, ch. 7, § 11. And in 1881, Illinois banned sale, transfer, and possession. JA1245. The Cheeseman Plaintiffs complain that more statutes had restricted carry than banned them, Resp. 42, but the principles test is no exercise in nose-counting, *see United States v. Perez-Garcia*, 96 F.4th 1166, 1191 (9th Cir. 2024) (rejecting this "divide-and-conquer approach to the historical evidence"). And the ANJRPC Plaintiffs decline to take slungshot bans head on, instead shifting to restrictions on clubs that they claim only restricted carry and were racist. Resp. 26-27. But statutes governing carry—including for pistols, *see* N.J. Br. 50-51—still bolster the State's analysis. *See supra* at 18-21. And even racist laws, abhorrent and inconsistent with equal protection as they are, can shed light on Second Amendment principles. *Kanter v. Barr*, 919 F.3d 437, 457-58 & n.7 (7th Cir. 2019) (Barrett, J., dissenting).

That leaves 20th-century bans on machineguns and semi-automatic firearms. Plaintiffs accept machinegun bans as constitutional, as they must. ANJRPC Resp. 28-29; Cheeseman Resp. 43. Plaintiffs assert only that they are disanalogous because machineguns were not widespread before their regulation and thus "are not and have not ever been in common use for self-defense," ANJRPC Resp. 20, 28-29, which merely repackages their circulation test, *see supra* at 8-14, and cannot be squared with the evidence that Founding- and Reconstruction-era States did restrict a range

of weapons once they had proliferated, *supra* at 22-25. As for semi-automatic arms, Plaintiffs cannot deny such bans existed, instead asserting that they "were ultimately repealed or replaced." ANJRPC Resp. 31; Cheeseman Resp. 43-44. But Plaintiffs cite no evidence that these previous repeals were based on *constitutional* concerns, rather than shifting policy attitudes in a representative democracy.

All told, the challenged law faithfully follows "a strong tradition of regulating those weapons that were invented for offensive purposes and were ultimately proven to pose exceptional dangers to innocent civilians." *Bianchi*, 111 F.4th at 471-72. It does so while "honoring" "the right of Americans to possess arms more compatible with the Second Amendment's purpose" and the "calls of citizens" fearing the "mass violence" that "will afflict their communities absent government intervention." *Id*. Our tradition permits New Jerseyans to make this choice, consistent with the Second Amendment, federalism, and democracy itself. *Id.* at 446-47.

## CONCLUSION

This Court should reverse the grant of summary judgment in part to Plaintiffs.

Respectfully submitted,

MATTHEW J. PLATKIN
Attorney General of New Jersey

By:  /s/ Jeremy M. Feigenbaum
Jeremy M. Feigenbaum
Solicitor General

Dated: February 28, 2025

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(g)(1) and L.A.R. 31.1(c), I certify that:

1.    This brief complies with the type-volume limitations of Fed. R. App. P. 28.1(e)(2)(C) because it contains 6,492 words, excluding sections exempted by Fed. R. App. P. 32(f), and thus does not exceed the 6,500-word limit.

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using the Microsoft Word word-processing system in Times New Roman that is at least 14 points.

3.    This brief complies with L.A.R. 31.1(c) in that prior to being electronically mailed to the Court today, it was scanned by the following virus detection software and found to be free from computer viruses:

        Company: CrowdStrike, Inc.
        Product: CrowdStrike Falcon Malware Scan.

4.    This brief complies with L.A.R. 31.1(c) in that the text of the electronic brief is identical to the text of the paper copies.

Dated: February 28, 2025

        /s/ Jeremy M. Feigenbaum
        Jeremy M. Feigenbaum
        Solicitor General

## **<u>CERTIFICATE OF BAR MEMBERSHIP</u>**

I certify that I am a member in good standing of the bar of the United States

Court of Appeals for the Third Circuit.

Dated: February 28, 2025

<u>/s/ Jeremy M. Feigenbaum</u>
Jeremy M. Feigenbaum
Solicitor General

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 28, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Third Circuit using the appellate CM/ECF system. Counsel of record for all parties are registered CM/ECF users and will be served by the appellate CM/ECF system. Counsel not registered CM/ECF users will be served by mail.

/s/ Jeremy M. Feigenbaum
Jeremy M. Feigenbaum
Solicitor General