Nos. 24-2415, 24-2450, 24-2506

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

ASSOCIATION OF NEW JERSEY RIFLE AND PISTOL CLUBS, INC., *et al.*,

Appellants/Cross-Appellees,

v.

ATTORNEY GENERAL NEW JERSEY, *et al.*,

Appellees/Cross-Appellants.

(Additional captions listed on inside cover.)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
Case Nos. 1:18-cv-10507, 1:22-cv-04360, 1:22-cv-04397
The Honorable Renée Marie Bumb

BRIEF FOR THE UNITED STATES AS AMICUS CURIAE
IN SUPPORT OF APPELLANTS/CROSS-APPELLEES
ON REHEARING EN BANC

JASON MANION
  Counselor to the Attorney General

HARMEET K. DHILLON
  Assistant Attorney General

JESUS A. OSETE
  Principal Deputy Assistant Attorney General

  U.S. Department of Justice
  Civil Rights Division
  950 Pennsylvania Avenue, NW
  Washington, D.C.  20530-0001
  (202) 598-0243

---

MARK CHEESEMAN, *et al.*,

Appellants/Cross-Appellees,

v.

ATTORNEY GENERAL NEW JERSEY, *et al.*,

Appellees/Cross-Appellants.

---

BLAKE ELLMAN, *et al.*,

Appellants/Cross-Appellees,

v.

ATTORNEY GENERAL NEW JERSEY, *et al.*,

Appellees/Cross-Appellants.

---

**TABLE OF CONTENTS**

INTEREST OF THE UNITED STATES ...................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................1

STATEMENT OF THE ISSUES............................................................................5

ARGUMENT ........................................................................................................5

    I.    The Second Amendment Protects Arms That Are "In Common Use" For All Lawful Purposes, Including The Common Defense ...........................................................................5

        A.    The Second Amendment Protects The Right To Possess Arms For Lawful Purposes Such As Self-Defense And The Common Defense ................................................5

        B.    The Second Amendment Protects Arms That Are In Common Use For Traditionally Lawful Purposes......................9

    II.    New Jersey's Complete Bans On Overwhelmingly Popular Rifles And Magazines Flagrantly Violate The Second Amendment ....................................................................................17

        A.    Rifles Such As The AR-15 Are In Common Use For Lawful Purposes And Are Fully Protected By The Second Amendment ................................................................17

        B.    Standard Magazines For The AR-15 And Handguns Are Also Fully Protected By The Second Amendment............20

CONCLUSION....................................................................................................25

CERTIFICATE OF BAR MEMBERSHIP............................................................26

CERTIFICATE OF COMPLIANCE....................................................................27

CERTIFICATE OF SERVICE .............................................................................28

# TABLE OF AUTHORITIES

**Federal Cases**

*Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*,
910 F.3d 106 (3d Cir. 2018) .................................................................25

*Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*,
974 F.3d 237 (3d Cir. 2020) .................................................................25

*Bevis v. City of Naperville*,
85 F.4th 1175 (7th Cir. 2023) ...............................................................5

*Bianchi v. Brown*,
111 F.4th 438 (4th Cir. 2024) (en banc) ...................................... 5, 19, 20, 21

*Caetano v. Massachusetts*,
577 U.S. 411 (2016).............................................................................18

*District of Columbia v. Heller*,
554 U.S. 570 (2008)............................................................... *passim*

*Duncan v. Bonta*,
19 F.4th 1087 (9th Cir. 2021) (en banc) .................................... 28, 29

*Florida v. Jardines*,
569 U.S. 1 (2013)................................................................................20

*Friedman v. City of Highland Park*,
577 U.S. 1039, 1042 (2015) ............................................... 6, 18, 23

*Friedman v. City of Highland Park*,
784 F.3d 406 (7th Cir. 2015) ...............................................................19

*Hanson v. District of Columbia*,
120 F.4th 223 (D.C. Cir. 2024)....................................... 26, 28, 29

*Harrel v. Raoul*,
144 S. Ct. 2491 (2024)........................................................................5

*Heller v. District of Columbia*,
670 F.3d 1244 (D.C. Cir. 2011)..................................... 23, 24

*Koons v. Att'y Gen. New Jersey*,
  __ F.4th __, 2025 WL 2612055 (3d Cir. Sept. 10, 2025)................................2

*Luis v. United States*,
  578 U.S. 5 (2016).......................................................................26

*Miller v. California*,
  413 U.S. 15 (1973).....................................................................20

*New York State Rifle & Pistol Ass'n v. Bruen*,
  597 U.S. 1 (2022)................................................................ *passim*

*Range v. Att'y Gen. United States*,
  124 F.4th 218 (3d Cir. 2024) (en banc) ............................................2

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*,
  605 U.S. 280 (2025)....................................................................22

*Snope v. Brown*,
  145 S. Ct. 1534 (2025)........................................................ *passim*

*United States v. Miller*,
  307 U.S. 174 (1939)......................................................... 7, 16, 26

*United States v. Petrillo*,
  332 U.S. 1 (1947).......................................................................20

*United States v. Rahimi*,
  602 U.S. 680, 698 (2024) .................................................... 14, 19

**State Cases**

*Andrews v. State*,
  50 Tenn. 165 (1871) ......................................................... *passim*

*Aymette v. State*,
  21 Tenn. 154 (1840) ......................................................... 9, 2, 18

*English v. State*,
  35 Tex. 473 (1871) ....................................................................9, 13

iii

*Fife v. State*,
31 Ark. 455 (1876) ...............................................................13

*Hill v. State*,
53 Ga. 472 (1874) ...............................................................20

*State v. Duke*,
42 Tex. 455 (1875) ....................................................... 9, 13, 18

*State v. Huntly*,
25 N.C. 418 (1843) ...............................................................11

*State v. Kerner*,
107 S.E. 222 (N.C. 1921) ....................................................... 13, 17

*State v. Langford*,
10 N.C. 381 (1824) ...............................................................11

*State v. Smith*,
11 La. Ann. 633 (1856) ...............................................................9

*State v. Workman*,
14 S.E. 9 (W.V. 1891) ....................................................... 13, 17

**Federal Constitutional Provisions**

U.S. Const. Amend. II................................................................2, 6

U.S. Const. Art. I § 8................................................................17

**Federal Statutes**

10 U.S.C. § 246................................................................6

Militia Act of 1792, ch. 33, 1 Stat. 271 ....................................................... 11, 22

**State Statutes**

Act of May 5, 1777 (Va.)................................................................22

**Federal Rules**

Fed. R. App. P. 29................................................................1

iv

Third Circuit L.A.R. 29.1.................................................................................1

**Other Authorities**

Assize of Arms, 27 Hen. 2 (1181) (Eng.) .......................................................12

David S. Kopel & Joseph G.S. Greenlee,
   *The History of Bans on Types of Arms Before 1900,*
   50 J. Legis. 223 (2024) .............................................................................15

Ellis Lewis,
   *An Abridgment of the Criminal Law of the United States* (1848) .................14

Exec. Order No. 14,206,
   *Protecting Second Amendment Rights*, 90 Fed. Reg. 9503 (Feb. 7, 2025). ....1

Francis Wharton,
   *A Treatise on The Criminal Law of the United States* (1846).......................15

Granville Sharp,
   *Tracts, Concerning the Ancient and Only True Legal Means of National
   Defense, by a Free Militia* (1781) .............................................................13

Herbert L. Osgood,
   *The American Colonies in the 17th Century* (1904)....................................26

John A. Dunlap,
   *The New-York Justice* (1815) ...................................................................15

Joseph Story,
   *Commentaries on the Constitution of the United States* (1833)....................10

Memo. from the U.S. Att'y Gen.,
   *Second Amendment Enforcement Task Force* (Apr. 8, 2025) .........................1

Nat'l Shooting Sports Found.,
   *Detachable Magazine Report 1990 – 2021* (Apr. 12, 2024)................. 29, 30

St. George Tucker,
   *Blackstone's Commentaries* (1803)............................................................10

Statute of Northampton,
    2 Edw. 3 (1328) ................................................................................12

Statute of Northampton,
    7 Rich. II, c. 13 (1383).....................................................................13

*The Statutes at Large* (William Waller Hening ed. 1821)........................................27

Thomas Cooley,
    *The General Principles of Constitutional Law in the United States* 271
    (1880)....................................................................................7, 8

U.S. Amicus Br. at 4-8,
    *Barnett v. Raoul*, No. 24-3060 (7th Cir. June 13, 2025) ..........................3, 26

William Baude & Robert Leider,
    *The General-Law Right to Bear Arms*,
    99 Notre Dame L. Rev. 1467, 1500 (2024)..................................... 11, 22, 23

William Blackstone,
    *Commentaries on the Constitution of the Laws of England*
    (10th ed. 1787)................................................... 9, 12, 13, 20

William Blizard,
    *Desultory Reflections on Police* (1785).........................................8

William Hawkins,
    *Pleas of the Crown* (1716).......................................................13

William Rawle,
    *A View of the Constitution of the United States* (1825)................................10

**INTEREST OF THE UNITED STATES**

President Donald J. Trump has instructed his Administration to "protect the Second Amendment rights of all Americans."  Exec. Order No. 14,206, *Protecting Second Amendment Rights*, 90 Fed. Reg. 9503 (Feb. 7, 2025).  Attorney General Pamela Bondi has likewise instructed the Department of Justice "to use its full might to protect the Second Amendment rights of law-abiding citizens."  Memo. from the U.S. Att'y Gen., *Second Amendment Enforcement Task Force* (Apr. 8, 2025).

These consolidated cases pose important questions about the scope of the Second Amendment's protections.  The United States has strong interests in ensuring that these important questions are correctly resolved; that the Second Amendment is not treated as a second-class right; and that law-abiding Americans in this Circuit are not deprived of the full opportunity to enjoy the exercise of their Second Amendment rights.

The United States is permitted to file amicus briefs without the consent of the parties or leave from the Court.  *See* Fed. R. App. P. 29.  Because this Court has not directed otherwise, amicus briefs on rehearing in this case are permitted to be filed by September 18, 2025, under this Court's local appellate rules.  L.A.R. 29.1(a).

**INTRODUCTION AND SUMMARY OF ARGUMENT**

Three years ago, the Supreme Court issued a landmark decision reinforcing the principle that the Second Amendment is not a "second-class right, subject to an

1

entirely different body of rules than the other" constitutional rights. *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 70 (2022) (citation omitted). As this Court has since noted, "*Bruen* abrogated" some important aspects of this Circuit's preexisting "Second Amendment jurisprudence," thereby requiring this Court to revisit some of that jurisprudence. *See Range v. Att'y Gen. United States*, 124 F.4th 218, 225 (3d Cir. 2024) (en banc); *see also generally, e.g.*, *Koons v. Att'y Gen. New Jersey*, __ F.4th __, 2025 WL 2612055, at *7-8 (3d Cir. Sept. 10, 2025).

Before *Bruen*, a divided panel of this Court had held that New Jersey's complete bans on possessing rifles such as the AR-15 and ammunition magazines with a more-than-ten-round capacity survived intermediate scrutiny and thus did not violate the Second Amendment. But the Supreme Court then granted, vacated, and remanded this case for reconsideration in light of *Bruen*. The en banc Court should now hold that, under *Bruen*, these provisions violate the Second Amendment.

The Second Amendment guarantees "the right of the people to keep and bear Arms." U.S. Const. Amend. II. The United States understands it to be undisputed in this case that AR-15s qualify as "Arms." For good reason. The Supreme Court has recognized that, at the Founding, "all firearms constituted 'arms.'" *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008) (citation omitted); *see* U.S. Amicus Br. at 4-8, *Barnett v. Raoul*, No. 24-3060 (7th Cir. June 13, 2025).

2

This amicus brief addresses two principles of Second Amendment doctrine that have confused other courts.  First, the Second Amendment does not secure the right to possess and carry arms only for self-defense or sporting-related purposes, but rather for *all* "traditionally lawful purposes."  *Heller*, 554 U.S. at 577.  History and tradition confirm that these purposes include the common defense.

Second, the Second Amendment protects arms that are "in common use" among law-abiding citizens for lawful purposes.  *Id.* at 624 (citation omitted).  To be sure, some other courts have criticized this common-use test.  But the Supreme Court's cases clearly show that it is the governing test for courts determining which arms the Second Amendment protects.  Not only that, but the common-use test has deep roots in both English and American law.

The Second Amendment's irreducible minimum guarantee incorporates both principles:  Legislatures may not completely ban arms that are in common use among law-abiding citizens for lawful purposes without running afoul of the Constitution.

Applying these principles to the state law at issue here, New Jersey's complete bans on possessing rifles such as the AR-15 and magazines with a more-than-ten-round capacity violate the Second Amendment.  Because rifles such as the AR-15 are in common use for lawful purposes, including self-defense, sporting, and the common defense, the Second Amendment protects law-abiding New Jerseyans' right to possess them.  The Second Amendment also protects those New Jerseyans'

3

right to possess magazines and other accessories that make constitutionally protected firearms useful for those same lawful purposes. Although such rifles and magazines are subject to reasonable regulations that are consistent with the Nation's historical tradition of firearm regulation, the complete bans at issue here are unconstitutional.

Some other courts of appeals have nonetheless incorrectly upheld state laws categorically banning overwhelmingly popular firearms and firearm attachments that Americans own for lawful purposes. *See, e.g.*, *Bianchi v. Brown*, 111 F.4th 438 (4th Cir. 2024) (en banc); *Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023). But multiple Supreme Court Justices, including *Bruen*'s author, have made clear that they disagree with these lower-court opinions and that the Supreme Court is likely to grant certiorari "in the next Term or two" to address the errors in those opinions. *See Snope v. Brown*, 145 S. Ct. 1534, 1534 (2025) (statement of Kavanaugh, J.); *id.* at 1538 (Thomas, J., dissenting); *Harrel v. Raoul*, 144 S. Ct. 2491, 2492-93 (2024) (statement of Thomas, J.). New Jersey and other States that have enacted similar laws invoke the important objective of preventing firearm violence, but States must comply with the Second Amendment even when pursuing that laudable goal.

This Court must make clear that the Second Amendment does not allow New Jersey to ban "the most popular rifle in America," the AR-15. *Snope*, 145 S. Ct. at 1538 (Thomas, J., dissenting). Nor does it allow New Jersey to ban more-than-ten-round magazines, which are significantly more popular than AR-15s themselves.

4

## STATEMENT OF THE ISSUES

In this brief, the United States addresses only the following issues:

1.  Whether rifles such as the AR-15 are in common use for lawful purposes and are therefore fully protected by the Second Amendment.

2.  Whether standard magazines for the AR-15 and handguns are likewise fully protected by the Second Amendment.

## ARGUMENT

**I.    The Second Amendment Protects Arms That Are "In Common Use" For All Lawful Purposes, Including The Common Defense.**

**A.    The Second Amendment Protects The Right To Possess Arms For Lawful Purposes Such As Self-Defense And The Common Defense.**

A ban on a class of arms that is commonly used for "traditionally lawful purposes" violates the Second Amendment.  *See Heller*, 554 U.S. at 577, 628-35. By contrast, a ban on weapons that are "specially adapted to unlawful uses" does not raise constitutional concerns.  *Friedman v. City of Highland Park*, 577 U.S. 1039, 1042 (2015) (Thomas, J., dissenting).

In *Heller*, the Supreme Court made clear that the lawful purposes protected by the Second Amendment include individual self-defense, but the Court did not limit the Second Amendment right to that purpose.  Quite to the contrary.  The Second Amendment also protects the right to possess and carry arms for the purpose of the *common* defense—*i.e.*, for the purpose of "repelling invasions," "suppressing

insurrections," or "resist[ing] tyranny." *Heller*, 554 U.S. at 597-98. Thus, the arms protected by the Amendment include weapons that are "suitable for the general defence of the community against invasion or oppression." Thomas Cooley, *The General Principles of Constitutional Law in the United States* 271 (1880).

This conclusion also follows from the Second Amendment's prefatory clause, which explains that the Constitution codifies the right to keep and bear arms because a "well regulated Militia" is "necessary to the security of a free State." U.S. Const. Amend. II. The militia consists of "all males physically capable of acting in concert for the common defense." *United States v. Miller*, 307 U.S. 174, 179 (1939); *see also* 10 U.S.C. § 246(a); *Heller*, 554 U.S. at 595-96. By guaranteeing that "the people, from whom the militia must be taken, shall have the right to keep and bear arms," Cooley, *supra*, at 271, the Second Amendment allows citizens to "become familiar with their use in times of peace, that they may the more efficiently use them in times of war." *Andrews v. State*, 50 Tenn. 165, 178 (1871). The Second Amendment thus contemplates having a citizenry familiar with the use of arms that will allow them to protect the polity from "invasions," "insurrections," and "tyranny." *Heller*, 554 U.S. at 598. To be clear, the Second Amendment's prefatory clause does not mean that the people may exercise their Second Amendment rights *only* for the purpose of contributing to the common defense. *See id.* at 599. But the prefatory clause does establish that the common defense, like self-defense, is among

6

the "traditionally lawful purposes" for which individuals may possess and carry weapons. *Id.* at 577.

That interpretation of the Second Amendment accords with its historical background. The Second Amendment descends from a provision of the English Bill of Rights guaranteeing the rights of Protestant subjects to possess arms. *See id.* at 593. English jurists understood that the "lawful purposes, for which arms may be used, besides immediate self-defense," included both "the general defence of [the] country" and "the defence of the kingdom against foreign invaders." William Blizard, *Desultory Reflections on Police* 63-64 (1785) (punctuation omitted). Blackstone similarly wrote that the right to bear arms reflected "the natural right of resistance" against "oppression." 1 William Blackstone, *Commentaries on the Constitution of the Laws of England* 144 (10th ed. 1787).

Confirming this reading, thirteen States adopted analogues to the Second Amendment between 1776 and 1820. *See Heller*, 554 U.S. at 599-03. Ten of those state analogues protected the people's right to bear arms in defense of "themselves" (or "himself") and "the State" (or the "province")—language that encompasses both self-defense and the common defense. *See id.* at 601-603 (citations omitted). The remaining three state provisions protected the right to bear arms for the "common defence" and did not specifically refer to individual self-defense. *See ibid.* In *Heller*, the Court treated the fact that ten out of the thirteen provisions referred to self-

7

defense as "strong evidence" that the Second Amendment protects the right to keep and bear arms for individual self-defense. *Id.* at 603. *A fortiori*, the fact that *all thirteen* provisions refer to the common defense shows that the Second Amendment protects the right to keep and bear arms for that purpose as well.

Early commentators routinely explained, moreover, that the individual right to keep and bear arms enabled the American people to protect the polity from threats such as invasion and tyranny. St. George Tucker described the right to keep and bear arms as "the true palladium of liberty" and warned that tyrannical rulers would seek "to confine this right within the narrowest limits possible." 1 St. George Tucker, *Blackstone's Commentaries* App. 300 (1803). William Rawle wrote that the right to keep and bear arms helps ensure that the people "are ready to repel invasion, to suppress insurrection, and preserve the good order and peace of government." William Rawle, *A View of the Constitution of the United States* 121 (1825). And Justice Story explained that the right to keep and bear arms "offers a strong moral check against the usurpation and arbitrary power of rulers; and will generally, even if these are successful in the first instance, enable the people to resist and triumph over them." 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1890, at 746 (1833).

Finally, judicial decisions reflect this understanding of the right to keep and bear arms. State-court decisions from the 19th century uniformly recognized that

8

the right extends to arms that are useful for the common defense, not just to arms that are useful for individual self-defense. *See, e.g.*, *State v. Duke*, 42 Tex. 455, 458 (1875) (right protects arms that are "appropriate for open and manly use in self-defense, as well as such as are proper for the defense of the State"); *Andrews*, 50 Tenn. at 179 (right protects arms that are useful for a citizen's "defense of his own liberties, as well as of the State"); *English v. State*, 35 Tex. 473, 476 (1871) (right protects the "arms of a militiaman or soldier"); *State v. Smith*, 11 La. Ann. 633, 633 (1856) (right protects arms used for "public defence"); *Aymette v. State*, 21 Tenn. 154, 159 (1840) ("right to keep and bear arms for the common defence"). Indeed, "[t]his rule was not some outlier position. *Every* nineteenth-century court and legal treatise writer to consider the question understood that arms useful for militia service fell within the very core of the right." William Baude & Robert Leider, *The General-Law Right to Bear Arms*, 99 Notre Dame L. Rev. 1467, 1500 (2024).

**B.    The Second Amendment Protects Arms That Are In Common Use For Traditionally Lawful Purposes.**

In determining which arms the Second Amendment protects, courts must ask whether the arms are "in common use" among law-abiding citizens for lawful purposes—not rely on their own intuitions about which types of arms are useful for traditionally lawful purposes. *See Heller*, 554 U.S. at 624. Some courts have criticized or declined to apply this common-use test. But that approach is erroneous.

The common-use test has deep roots in both English and American law, and the Supreme Court has repeatedly invoked it in its Second Amendment cases.

1.    In England, the tradition of distinguishing between common weapons and unusual weapons stretches back nearly a millennium.  Early statutes "obliged every man, according to his estate and degree, to provide a determinate quantity of such arms as were then in use, in order to keep the peace." 1 Blackstone, *supra*, at 410.  For example, the Assize of Arms required individuals to have lances, helmets, hauberks, and shields.  Assize of Arms, 27 Hen. 2 (1181) (Eng.).  Parliament periodically updated the list of required arms to include those "of more modern service."  1 Blackstone, *supra*, at 411.

In contrast, the Statute of Northampton, 2 Edw. 3 (1328), prohibited riding or going armed to the terror of the people.  That offense could be committed by publicly carrying dangerous and unusual weapons.  *See Bruen*, 597 U.S. at 47.  For example, Richard II added to the Statute of Northampton a prohibition on carrying of lancegays (a light throwing lance), 7 Rich. II, c. 13 (1383), which were generally used for "combat" or to "breach the peace."  *Bruen*, 597 U.S. at 41.

That distinction between common and unusual weapons survived in English law through the 18th century.   Blackstone wrote that the Statute of Northampton forbade "riding or going armed with dangerous or unusual weapons."  4 Blackstone, *supra*, at 149.  Sergeant William Hawkins explained that individuals were "in no

10

Danger of Offending against this Statute by wearing common Weapons." 1 William Hawkins, *Pleas of the Crown* 136 (1716). And scholar Granville Sharp wrote that the English Bill of Rights permitted "limitations" on "particular sorts of arms," such as "cross-bows," that favored "the designs of murderers" and were not commonly used by law-abiding subjects. Granville Sharp, *Tracts, Concerning the Ancient and Only True Legal Means of National Defense, by a Free Militia* 17-18 (1781).

American legislatures, too, have long distinguished between common weapons and unusual weapons. Under early federal, state, and colonial militia laws, the "traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes." *Heller*, 554 U.S. at 624. For instance, the Militia Act of 1792, ch. 33, 1 Stat. 271, required every militia member to supply himself with a "a good musket or firelock" or "a good rifle." § 1, 1 Stat. 271.

Additionally, several state legislatures in the 18th and early 19th centuries adopted going-armed laws modeled on the Statute of Northampton. *See United States v. Rahimi*, 602 U.S. 680, 698 (2024). Other American jurisdictions also incorporated the prohibition on going armed through the common-law. *See State v. Huntly*, 25 N.C. 418, 418 (1843). Like their English precursor, American going-armed laws prohibited the public carrying of "dangerous and unusual weapons" to the terror of the people but did not restrict the peaceable carrying of common arms. *State v. Langford*, 10 N.C. 381, 383 (1824); *see, e.g.*, Ellis Lewis, *An Abridgment of*

11

*the Criminal Law of the United States* 64 (1848); Francis Wharton, *A Treatise on The Criminal Law of the United States* 526 (1846); John A. Dunlap, *The New-York Justice* 8 (1815).

Many 19th-century American legislatures, moreover, banned the possession, carrying, or sale of specific types of weapons. One law-review article identified 221 19th-century state and territorial laws targeting Bowie knives, a class of weapons associated with hand-to-hand fighting. *See* David S. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. Legis. 223, 293 (2024). Other restrictions targeted unusual weapons such as spears, sword canes, slungshots, brass knuckles, and cannons. *See id.* at 328-368.

State courts routinely upheld such laws on the ground that the right to keep and bear arms extended only to arms that are in common use for lawful purposes. The Supreme Court of Tennessee, for instance, explained that individuals have a right to possess commonplace weapons (such as "rifles" and "muskets") but that legislatures may prohibit weapons that are "dangerous" and "not usual" (such as "a spear concealed in a cane"). *Aymette*, 21 Tenn. at 159, 161. The Supreme Court of North Carolina likewise explained that the right to keep and bear arms extends to arms "in common use," such as "the rifle, the musket, the shotgun, and the pistol," but not to "cannon[s]," "poisonous gases," and armed aircraft, nor to small concealable weapons such as "brass knuckles." *State v. Kerner*, 107 S.E. 222, 224-

12

225 (N.C. 1921).  Other state-court decisions drew similar distinctions.  *See, e.g.,* *State v. Workman*, 14 S.E. 9, 11 (W.V. 1891) (right extends to "guns, rifles, and muskets" but not to weapons that are "only habitually carried by bullies, blackguards, and desperadoes"); *Fife v. State*, 31 Ark. 455, 460 (1876) (right extends to "the usual arms of the citizen," such as "the shot gun" and "the musket"); *Duke*, 42 Tex. at 458 (right extends to "such arms as are commonly kept, according to the customs of the people"); *Andrews*, 50 Tenn. at 179 (right extends to "the usual arms of the citizen of the country"); *English*, 35 Tex. at 476-77 (right extends to "musket[s]" and "pistols" but not "sword-canes, brass knuckles, and bowie knives").

2.      The Supreme Court adopted the common-use test in *United States v. Miller*, 307 U.S. 174 (1939), a case concerning the constitutionality of a federal law restricting short-barreled shotguns.  In upholding the statute, the Court reasoned that the Second Amendment protects arms "of the kind in common use at the time." *Id.* at 179.  Because short-barreled shotguns did not satisfy that criterion—among other things, they did not form "part of the ordinary military equipment" and thus did not "contribute to the common defense"—the Court held that the Second Amendment did not guarantee "the right to keep and bear such an instrument." *Id.* at 178.

The Supreme Court reaffirmed that holding in *Heller*.  *Heller* read *Miller* to hold that "the sorts of weapons protected [a]re those 'in common use at the time'" and that legislatures may prohibit weapons, such as short-barreled shotguns, that are

13

"not typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625, 627 (citation omitted). That interpretation, *Heller* stated, "is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* at 627 (citation omitted). It also, *Heller* added, fits with Founding-era practice, under which the "militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes." *Id.* at 624. Finally, the Court in *Heller* also applied the "common use" test in holding that the Second Amendment protects the right to possess handguns. *See id.* at 628-35. Handguns, the Court emphasized, are "the most popular weapon chosen by Americans for self-defense in the home," "'the most preferred firearm in the nation to 'keep' and use for protection of one's home and family,'" and "overwhelmingly chosen by American society for that lawful purpose." *Id.* at 628-29 (citation omitted).

The Court then reiterated the common-use test in *Bruen*. It stated that "the Second Amendment protects the possession and use of weapons that are 'in common use at the time,'" 597 U.S. at 21 (citation omitted), and that handguns are protected because "handguns are weapons 'in common use' today," *id.* at 32. The Court also contrasted weapons that are "in common use at the time" with weapons that are "highly unusual in society at large," explaining that the Second Amendment allows legislatures to prohibit the latter, but not the former, class of weapons. *Id.* at 47 (citation omitted).

14

Individual Justices, too, have repeatedly invoked the "common use" test. Justice Thomas has explained that the Second Amendment protects "commonly used" arms. *Friedman*, 577 U.S. at 1042 (Thomas, J., dissenting). Justice Alito has written that "the pertinent Second Amendment inquiry is whether [the weapons at issue] are commonly possessed by law-abiding citizens for lawful purposes today." *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring in the judgment) (emphasis omitted). And Justice Kavanaugh has endorsed "the historically based 'common use' test with respect to the possession of particular weapons." *Snope*, 145 S. Ct. at 1534 (statement of Kavanaugh, J.); *see Rahimi*, 602 U.S. at 735 (Kavanaugh, J., concurring) ("[T]he Second Amendment attaches only to weapons 'in common use.'").

3.      Some courts of appeals have eschewed inquiring into the commonality of weapons. *See, e.g.*, *Bianchi*, 111 F.4th at 460; *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015). But those courts' reasons for rejecting that test are incorrect.

To begin, these other courts erred in deriding the common-use standard as a "circular" inquiry, *Friedman*, 784 F.3d at 409, and as an "ill-conceived popularity test," *Bianchi*, 111 F.4th at 460. The point of the common-use test is that "the American people," rather than federal judges, get "to decide which weapons are useful" for lawful purposes. *Snope*, 145 S. Ct. at 1537 (Thomas, J., dissenting). "A

15

constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all." *Heller*, 554 U.S. at 634. Thus, instead of relying on their "own assessment of how useful an arm is for self-defense [or other lawful purposes] before deeming it protected," judges must defer to the practices of the American people. *Snope*, 145 S. Ct. at 1538 (Thomas, J., dissenting).

Such reliance on community practices is hardly unusual in Anglo-American law. For example, the First Amendment requires courts to determine whether expressive material is obscene by applying "contemporary community standards." *Miller v. California*, 413 U.S. 15, 24 (1973) (citation omitted). Whether an intrusion constitutes an unreasonable search under the Fourth Amendment depends in part on whether the intrusion is consistent with "customary" practices and "'the habits of the country.'" *Florida v. Jardines*, 569 U.S. 1, 8-9 (2013) (citation omitted). And the common law itself is built on community customs. 1 Blackstone, *supra*, at 64.

Courts also have erred in suggesting that courts would face "difficulties" in judging "which weapons would pass" the common-use test. *Bianchi*, 111 F.4th at 460. Courts have been applying the test for centuries without apparent difficulty. A court should face no trouble in concluding, for instance, that rifles and handguns are in common use for lawful purposes, or that sword canes and spears are not. Some types of weapons may, of course, raise harder questions. But under any legal test, "there may be marginal cases in which it is difficult to determine the side of the line

16

on which a particular fact situation falls." *United States v. Petrillo*, 332 U.S. 1, 7 (1947). That is not a good enough reason to decline to apply a governing legal test.

Finally, some courts have expressed concern that the common-use test would lead to "absurd consequences," such as allowing "nuclear warhead[s]" to "gain constitutional protection" if they become "popular." *Bianchi*, 111 F.4th at 460. But that concern is implausible. "Even if some nuclear warheads are small enough for an individual to carry, no reasonable person would think to use one to defend himself. Still less could nuclear warheads ever become a *common* means of self-defense." *Snope*, 145 S. Ct. at 1538 (Thomas, J., dissenting). Such weapons also are highly unusual even in military contexts and are wholly inappropriate for a citizen to use when "call[ed] forth . . . to execute the Laws of the Union, suppress Insurrections and repel Invasions." U.S. Const. Art. I, § 8, cl. 15.

## II. New Jersey's Complete Bans On Overwhelmingly Popular Rifles And Magazines Flagrantly Violate The Second Amendment.

### A. Rifles Such As The AR-15 Are In Common Use For Lawful Purposes And Are Fully Protected By The Second Amendment.

Applying these principles to this case, the Second Amendment protects the right to possess rifles such as the AR-15. Courts have long identified rifles as the paradigmatic example of weapons that are in common use for lawful purposes. *See, e.g.*, *Kerner*, 107 S.E. at 224 (arms of the "ordinary private citizen" include "the rifle"); *Workman*, 14 S.E. at 11 (weapons "used in defending the state and civil

17

liberty" include "rifles"); *Duke*, 42 Tex. at 458 (the "rifle" is among the "arms which the great mass of the people of the State have"); *Andrews*, 50 Tenn. at 179 ("the usual arms of the citizen" include "the rifle of all descriptions"); *Aymette*, 21 Tenn. at 160-161 ("usually employed" arms include "rifles").  Thus, while 19th-century courts debated the scope of the right to keep and bear arms, "not even the most restrictive courts debated whether rifles and muskets designed for military use fell within the 'arms' protected by the right."  Baude & Leider, *supra*, at 1500-1501.  "On this question," the law "was unanimously understood."  *Id.* at 1501.

Rifles, including the AR-15, remain in common use today for both self-defense and the common defense, as well as for other lawful sporting-related purposes.  As the Supreme Court noted earlier this year, "[t]he AR-15 is the most popular rifle in the country."  *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 297 (2025).  "Americans today possess an estimated 20 to 30 million AR-15s," and "AR-15s are legal in 41 of the 50 States."  *Snope*, 145 S. Ct. at 1534 (statement of Kavanaugh, J.).  And "[t]he overwhelming majority of citizens who own and use such rifles do so for lawful purposes, including self-defense and target shooting."  *Friedman*, 577 U.S. at 1042 (Thomas, J., dissenting).

Indeed, as Justice Kavanaugh recently explained, the protection of rifles such as the AR-15 follows *a fortiori* from *Heller*'s holding that the Second Amendment protects handguns.  *See Snope*, 145 S. Ct. at 1534 (statement of Kavanaugh, J.).

18

"Law-abiding citizens use both AR-15s and handguns for a variety of lawful purposes, including self-defense in the home." *Ibid.* "For their part, criminals use both AR-15s and handguns, as well as a variety of other lawful weapons and products, in unlawful ways." *Ibid.* "But handguns can be more easily carried and concealed than rifles, and handguns—not rifles—are used in the vast majority of murders and other violent crimes that individuals commit with guns in America." *Ibid.* And while *most* 19th-century courts agreed that individuals have a right to possess handguns, *see Heller*, 554 U.S. at 629, *all* 19th-century courts to consider the question agreed that they have a right to possess rifles, *see* Baude & Leider, *supra*, at 1500-01. Interpreting the Second Amendment to provide less protection to rifles than handguns would thus be "backwards." *Heller v. District of Columbia*, 670 F.3d 1244, 1286 (D.C. Cir. 2011) (Kavanaugh, J., dissenting).

None of this is to suggest that legislatures lack all power to regulate rifles. Legislatures may regulate rifles, as well as other firearms, so long as the regulations are "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. For example, legislatures may regulate the mode or manner in which rifles fire ammunition by prohibiting fully automatic firearms. *See, e.g.*, *Heller*, 554 U.S. at 624-25 (there is no Second Amendment right to own "machineguns"); *Heller*, 670 F.3d at 1287 (Kavanaugh, J., dissenting) ("full automatics" have long "been subjected to comprehensive federal regulation"). Legislatures also may

19

impose reasonable regulations on the storage and use of rifles, so long as the legislature regulates arms-bearing for a valid reason and the scope of the burden it imposes fits within our historical tradition. *See Bruen*, 597 U.S. at 29.

But the scope of reasonable regulation is also grounded in historical limits. A legislature may not target arms by singling out their constitutionally protected features. For example, legislatures may not restrict rifle features, such as flash suppressors and bayonet lugs, that make the rifles useful for lawful purposes, including for the common defense. *See Hill v. State*, 53 Ga. 472, 474 (1874) (recognizing bayonets as constitutionally protected arms). Nor may a legislature altogether ban the possession of overwhelmingly popular rifles such as the AR-15. Our Nation's regulatory tradition does not countenance such a "prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society" for lawful purposes. *Heller*, 554 U.S. at 628.

### B. Standard Magazines For The AR-15 And Handguns Are Also Fully Protected By The Second Amendment.

The Second Amendment also protects the right to possess magazines and other accessories that make constitutionally protected firearms useful for individual and common defense. The challenged law here, which limits ammunition capacity to ten rounds, impermissibly burdens that right, and thus is not justified by *Bruen*'s text, history, and tradition approach.

1.    Some members of this Court have concluded that magazines are "Arms" under the Second Amendment. *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 910 F.3d 106, 116 (3d Cir. 2018) ("*NJ Rifle I*"); *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 974 F.3d 237, 254 (3d Cir. 2020) (Matey, J., dissenting) ("*NJ Rifle II*"). Others have recognized that, at minimum, a ban on magazines burdens the ability to use a weapon in common use for self-defense in the home. *NJ Rifle I*, 910 F.3d at 128 (Bibas, J., dissenting).

Regardless of whether magazines themselves constitute "Arms," the right to possess magazines forms part of the "right to keep and bear Arms" guaranteed by the Second Amendment. "Constitutional rights . . . implicitly protect those closely related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 26-27 (2016) (Thomas, J., concurring in judgment). Thus, "[t]he right to keep arms[] necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair." *Andrews*, 50 Tenn. at 178; *see Miller*, 307 U.S. at 180 ("The possession of arms also implied the possession of ammunition.") (quoting 1 Herbert L. Osgood, *The American Colonies in the 17th Century* 499 (1904)); *see also* U.S. Amicus Br. at 22-26, *Barnett v. Raoul*, No. 24-3060 (7th Cir. June 13, 2025). And because both arms and ammunition are constitutionally protected, it follows that magazines, which feed constitutionally protected ammunition into a constitutionally

21

protected arm, are constitutionally protected as well. *See, e.g.*, *Hanson v. District of Columbia*, 120 F.4th 223, 232 (D.C. Cir. 2024).

History supports this conclusion. The Militia Act of 1792 required every militia member to supply himself with not only a "a good musket or firelock" or "a good rifle," but also "a knapsack, a pouch with a box therein to contain not less than twenty-four cartridges, suited to the bore of his musket or firelock, each cartridge to contain a proper quantity of powder and ball." Militia Act of 1792, § 1, 1 Stat. 271. For those armed with rifles, federal law required "a knapsack, shot-pouch[,] and powder-horn, twenty balls suited to the bore of his rifle, and a quarter pound of powder." *Ibid.* Eighteenth-century colonial and state statutes similarly required individuals to have a cartridge box containing a sufficient number of cartridges to allow citizens to act in the common defense when called for service. *See, e.g.*, Act of May 5, 1777 (Va.), *in The Statutes at Large* 267 (William Waller Hening ed. 1821). Thus, American law and tradition have long supported the right (and duty) of individual citizens to equip themselves with devices for holding sufficient ammunition to provide for the common defense.

Logic and history confirm that the Second Amendment secures more than the right to have a minimally functional firearm. It also secures the right to have a firearm configured in a manner that makes it useful for lawful purposes, including individual and common defense. Although most repeating firearms are capable of

firing with the magazine removed, such single-shot firearms would neither be appropriate for individual or common defense in modern conditions, nor well-suited to other lawful sporting-related purposes. *See, e.g.*, *Duncan v. Bonta*, 19 F.4th 1087, 1151 (9th Cir. 2021) (en banc) (Bumatay, J., dissenting). Given present technology, the Second Amendment secures to citizens the right to have self-loading firearms with a magazine capacity adequate to use for lawful purposes.

2.    Although the government may not completely ban constitutionally protected arms, it may nevertheless regulate those arms if those regulations are "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. The ten-round limit in the New Jersey law at issue here, however, does not accord with the American tradition of regulating firearm ownership.

Magazines with a more-than-ten-round capacity are extremely common throughout the United States. Indeed, they are much more common than AR-15s themselves. "Americans have in their hands and homes [at least] an estimated 100 million" such magazines, *see Hanson*, 120 F.4th at 269 (Walker, J., dissenting), with one study showing that more than 500 million rifle magazines and more than 200 handgun magazines that would be banned by the law at issue here have been sold or made available in the United States between 1990 and 2021. *See* Nat'l Shooting Sports Found., *Detachable Magazine Report 1990 – 2021*, at 3 (Apr. 12, 2024), *available at* https://perma.cc/4493-G39D. These magazines are "a standard

23

component on many of the nation's most popular firearms," and "are lawful in [most] states and under Federal law." *Duncan*, 19 F.4th at 1155 (Bumatay, J., dissenting); *Hanson*, 120 F.4th at 270 (Walker, J., dissenting). And they are frequently "used for lawful purposes, like home defense." *Duncan*, 19 F.4th at 1155 (Bumatay, J., dissenting); *Hanson*, 120 F.4th at 270 (Walker, J., dissenting). Our Nation's regulatory tradition does not allow a "prohibition of an entire class of [magazines] that is overwhelmingly chosen by American society." *See Heller*, 554 U.S. at 628.

To be sure, legislatures have some power to regulate magazines. But such restrictions must be consistent with history and tradition. For instance, regulations that do not further legitimate public safety interests would fail, as would regulations that handicap a person's ability to engage in self-defense, the common defense, or other lawful sporting-related purposes.

The magazine restrictions in the New Jersey law at issue here were ostensibly passed for the laudable purpose of preventing mass shootings. But even a laudable purpose cannot justify the significant infringement of Second Amendment rights that would result from handicapping New Jerseyans' ability to pursue the Second Amendment's core purposes, including individual self-defense and common defense. *See Bruen*, 597 U.S. at 26; *Heller*, 554 U.S. at 635. The vast majority of Americans choose magazines with a more-than-ten-round capacity instead of

magazines with a lesser capacity. *Detachable Magazine Report 1990 – 2021*, *supra*, at 3. "Our Constitution allows the American people—not the government—to decide which weapons are useful for self-defense" and other lawful purposes. *Snope*, 145 S. Ct. at 1537 (Thomas, J., dissenting). The same is true of magazines.

## CONCLUSION

This Court should hold that New Jersey's complete bans on possessing overwhelmingly popular rifles such as the AR-15 and magazines with a more-than-ten-round capacity flagrantly violate the Second Amendment.

Respectfully submitted,

s/ *Jason Manion*

| | |
|---|---|
| HARMEET K. DHILLON | JASON MANION |
|   Assistant Attorney General |   Counselor to the Attorney General |

JESUS A. OSETE
  Principal Deputy Assistant Attorney
    General

U.S. Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001
(202) 598-0243

Date: September 18, 2025

25

## CERTIFICATE OF BAR MEMBERSHIP

Pursuant to Local Rules 28.3(d) and 46.1(a), I certify that I am exempt from the Third Circuit's bar admission requirement as counsel representing the United States.

s/ *Jason Manion*
Jason Manion

Date:  September 18, 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B)(i) because it contains 5,993 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it was prepared in Times New Roman 14-point font using Microsoft Word for Microsoft 365. Additionally, it complies with the requirements of Local Rule 31.1(c) because the text of the electronic brief is identical to the text in any paper copies of this brief that are submitted to the Court, and the electronic version of this brief, prepared for submission via ECF, has been scanned with the most recent version of Crowdstrike Falcon Sensor (Version 7.27.19907.0) and is virus-free according to that program.

s/ *Jason Manion*
Jason Manion

Date: September 18, 2025

## CERTIFICATE OF SERVICE

On September 18, 2025, I filed this brief with the Clerk of the Court by using the CM/ECF system.  Participants in the case are registered CM/ECF users, and service will be accomplished by the CM/ECF system.  I also certify that, to comply with this Court's August 21, 2025 letter requesting additional paper copies of filed briefs, seventeen paper copies, identical to the brief filed electronically, will be sent to the Clerk of the Court by Federal Express.

s/ *Jason Manion*
Jason Manion